**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MARK E. HIBBERT,                              :
                                             :
                                             :       Civil No. 10-5386 (NLH)
          Plaintiff,                         :
                                             :
     v.                                      :
                                             :
                                             :       <u>**OPINION**</u>
BELLMAWR PARK MUTUAL HOUSING                 :
CORPORATION, PAT LEVINS, and                 :
BOB McCORMICK,                               :
                                             :
          Defendants.                        :
                                             :

<u>**APPEARANCES:**</u>

BARRY J. BERAN, ESQUIRE
BERAN & BERAN, ESQS.
BUILDING C – SUITE ONE
102 BROWNING LANE
CHERRY HILL, NJ 08003
     *Attorney for Plaintiff Mark E. Hibbert, Sr.,*

WILLIAM J. MARTIN, ESQUIRE
MARTIN, GUNN & MARTIN
216 HADDON AVENUE
SUITE 420
WESTMONT, NJ 08108
     *Attorney for Defendants Bellmawr Park Mutual Housing*
     *Corporation and Pat Levins,*

BOB MCCORMICK
506 W. BROWNING ROAD
BELLMAWR, NJ 08031
     *Pro Se Defendant.*

**Hillman, District J.**:

Currently pending before the Court is the Motion for Summary Judgment of Defendants Bellmawr Park Mutual Housing Corporation ("Bellmawr Park"), Pat Levins, and Bob McCormick [Docket No. 31.]  For the reasons that follow, the Motion will be granted in part and denied in part.

**I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This matter involves a discrimination dispute between Plaintiff Mark E. Hibbert and a non-profit corporation that provides low-cost housing in southern New Jersey, Defendant Bellmawr Park.  Hibbert is deaf and unable to communicate, except through sign language.[1]  (Defs.' Mot. Summ. J., Ex. C, Dep. of Mark Hibbert, Sr. ("Hibbert Dep.") 112:11-13, 113:9-10.)

Hibbert has been a sporadic resident of Bellmawr Park since childhood.  Between 1964 and 1979, he lived with his parents in a residence in the complex.[2]  (Id. at 62:20-25, 63:1.)  In 2003, Hibbert's father gave him a house in Bellmawr Park, located at 506 West Browning Road, that formerly belonged to Hibbert's grandmother.  (Id. at 65:23-66:3.)  According to Plaintiff, his mother and aunt accompanied him to a meeting with Bellmawr Park

---

[1]   All disputed facts are resolved in favor of Plaintiff, the non-moving party.

[2]   During this time, however, Plaintiff also attended a special school for deaf individuals which was not local.  (Id. at 68:8-11, 69:8-23.)

office manager Patricia Levins[3] to sign the Mutual Ownership
Contract for ownership of the 506 West Browning residence.  (Id.
at 67:16-17, 70:15-71:2.)  Plaintiff signed the contract that
day, but avers that he did so at the behest of his family and
did not understand what occurred since no sign language
interpreter was present during the meeting.  (Id. at 66:6-67:22,
70:15-71:9; Defs.' Mot. Summ. J., Ex. E.)  Upon signing the
contract, Hibbert moved into the residence.  In 2005, he built
an addition and added several improvements to the property.[4]
(Hibbert Dep. 17:13-18; Defs.' Mot. Summ. J., Ex. J.)

     In 2009, Plaintiff expressed an intent to sell the house
and move to Maine with his wife, who is also deaf.  Plaintiff
met with the Bellmawr Park Board of Trustees on December 1, 2009
to discuss his intent to sell his home and terminate his
membership in Bellmawr Park.  (Defs.' Mot. Summ. J., Exs. F & I;
Hibbert Dep. 111:13-25, 153:3-17.)  Hibbert's teenage son, Mark
Hibbert Jr. ("Mark Jr."), served some role as his interpreter
during the meeting.  (Id. at 121:13-122:7, 175:14-23; Ex. F.)
Defendant Levins and several other members of the Board also
attended the meeting.  (Hibbert Dep. 122:24-25; Defs.' Mot.
Summ. J., Ex. D, Dep. of Patricia Levins ("Levins Dep.") 50: 8-

---

[3]    Named in the caption as "Pat Levins."
[4]    Plaintiff avers that the addition and improvements cost him
approximately $70,000, (id. at 17:13-18), but his construction
contract and application seeking approval for the improvements
indicates that he only paid $31,500. (Defs.' Ex. J.)

18.)  According to Plaintiff, he requested that a sign language interpreter be present, but one was not provided.  (Hibbert Dep. 71:10-23; 167:16-23, 175:5-13.)  As a result, Hibbert maintains that he is unsure of what actually occurred at the meeting because he could not hear and was unable to understand.  (Id. at 122:13-124:9.)  Moreover, he contends that he never made a firm commitment to sell his interest in his property and move to Maine.  (Id. 149:18-150:19; 164:9-11.)

Following the December 2009 meeting, Defendant Robert McCormick was contacted by Levins regarding the 506 West Browning property and told him that Hibbert wanted to sell his home and its improvements.  (Id. at 154:7-11; Defs.' Mot. Summ. J., Ex. L, Dep. of Robert McCormick ("McCormick Dep.") 12:12-25.)  McCormick was interested in purchasing a unit in Bellmawr Park because his daughter lived there, and he had previously submitted a housing application to the Board several years before.  (Id. at 13:6-14:6.)  Following this initial contact, McCormick and Hibbert engaged in some form of communications regarding the sale of the property over the course of several months.[5]  (Id. at 15:17-17:11.)  During these conversations, Mark Jr., at the time a minor, served as the intermediary and interpreter.  (Hibbert Dep. 177:12-20, 179:16-20; McCormick Dep.

---

[5]   Plaintiff contends that McCormick visited the property uninvited and was aggressively pursuing the opportunity to buy Hibbert out. (Id. at 162:2-6.)

15:21-16:7; Defs.' Mot. Summ. J., Ex. H, Dep. of Mark Hibbert, Jr. ("Mark Jr. Dep.") 33:20-34:9.)  In this role, Mark Jr. relayed information between McCormick and his father, and met with McCormick in person to discuss the sale.  (Id.; McCormick Dep. 20:25-21:11, 27:15-29:18.)  According to Defendants, during this time, Hibbert repeatedly changed his mind about whether he wished to sell the property.  (Mark Jr. Dep. 28:24-25, 37:12-18, 47:10-19; McCormick Dep. 16:11-21:12.)

Whatever his intentions regarding the Bellmawr property, it appears uncontroverted that Hibbert inquired about properties in Maine.  (Hibbert Dep. 53:5-10.)  In February of 2010, he applied for a loan in the amount of $124,000 from Peoples United Bank. (Id. at 45:24-46:25, 47:3-13, 53:11-54:6; Defs.' Mot. Summ. J., Ex. Q.)  On the loan application, Hibbert listed his contact address as "Maine, TBD."  (Id.)  In early March of 2010, the Bank denied the request for the loan.  (Id.)

According to Mark Jr., on March 5, 2010, Hibbert finally made up his mind to sell the property, and Mark Jr. contacted Levins that day to inform her of his father's intent to sell and vacate the premises.  (Mark Jr. Dep. 34:13-25, 50:3-17, 57:23-58:5.)  Although the date of his signature is in contention, at some point Hibbert had signed a "move-out form" which indicated that he was moving and provided an address in Wells, Maine for future contact purposes.  (Defs.' Mot. Summ. J., Exs. N & O.)

On March 7, 2010, Hibbert received a check in the amount of $20,000 which the defendants connect to the sale of the property. (Hibbert Dep. 136:23-138:15.)  Hibbert says he did not know what the check was for, that it was handed to him in an envelope on the day he moved out, and that he had neither negotiated nor entered into any agreement to sell his interest in the property.  (Id. at 162:18-25.)  He acknowledges that he deposited the check into his bank account on March 8, 2010, but states that he did so for "safekeeping."  (Id. at 137:21-25, 139:14-17, 151:10-13.)  There are no documents in the record establishing the purpose of the check, or any other documents memorializing the purported sale of Hibbert's interest in the property.

On March 7, 2010, Plaintiff and his wife moved out of 506 West Browning.  Plaintiff hired a moving truck to assist with the move and spent the night packing.  (Id. at 139:22-140:2.) Approximately eleven individuals were present during the move, including Levins and several members of Plaintiff's family. (Id. at 140:10-21; Mark Jr. Dep. 58:14-25; Defs.' Mot. Summ. J., Ex. R, Dep. of Gaudencio G. Gonzales ("Gonzales Dep.") 16:18-17:25.)  According to Levins, all of Plaintiff's belongings were packed and ready to move out that morning, and she communicated with him during the move primarily through handwritten notes. (Levins Dep. 78:1-81:12; Defs.' Mot. Summ. J., Ex. S.)

6

Hibbert claims that he was unlawfully evicted and forced to move out of his home on March 7, 2010.  (Hibbert Dep. 41:20-25, 63:13-16, 141:19-25.)  More specifically, he believes that Levins, McCormick, and Mark Jr. took advantage of his disability and engaged in some sort of scheme to acquire his property.  He points to the hurried nature of the move, McCormick's aggressive pursuit of the property, his minor son's contacts with the Defendants, the overall lack of communication and confusion stemming from his disability, the unexplained check provided just two days before he vacated the premises in an amount below the value of the improvements, and the absence of any documents memorialized a conveyance of an interest in the property as evidence that Defendants took advantage of him and forced him from the property.

Hibbert filed a complaint against Bellmawr Park, Levins, and McCormick on September 17, 2010 in New Jersey state court. Plaintiff's pleading alleged violations of the federal Americans with Disabilities Act ("ADA") and Fair Housing Act ("FHA"), and Defendants therefore timely removed the matter to this Court on October 18, 2010 on the basis of federal question jurisdiction. [Docket No. 1.]  Plaintiff subsequently filed an amended complaint on April 24, 2012, in which he asserted the following counts against Defendants: (1) breach of contract; (2) violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A

7

§ 10:5-12 et seq.; (3) violation of the New Jersey Fair Eviction Notice Act, N.J.S.A. § 2A:42-10.15 et seq.; (4) violation of the ADA, 42 U.S.C. § 12101 et seq.; (5) violation of the New Jersey Statute of Frauds, N.J.S.A. § 25:1-5 et seq.; and (6) violation of the FHA, 42 U.S.C. § 3601 et seq. [Docket No. 27.]  On July 16, 2012, Defendants Bellmawr Park and Levins moved for summary judgment on the entirety of Plaintiff's amended complaint. [Docket No. 31.]  Defendant McCormick, appearing pro se, filed a letter with the Court on September 10, 2012.  [Docket No. 34.] Plaintiff filed a Response in Opposition on September 21, 2012 [Docket No. 36], to which Defendants Bellmawr Park and Levins replied on September 28, 2012.  [Docket No. 37.]  Accordingly, this matter is now ripe for judicial consideration.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**III. PRELIMINARY MATTERS**

Prior to reaching the merits of Defendants' Motion for Summary Judgment, the Court must first address the presence of Defendant McCormick in the instant matter.

While Defendants Bellmawr Park and Levins are represented by the law firm of Martin, Gunn, & Martin, Defendant McCormick has opted to appear *pro se* in this litigation.  On July 16, 2012, Bellmawr Park and Levins filed the summary judgment motion that is presently before the Court for disposition, requesting judgment in their favor.  Defendant McCormick was not a party to this Motion, nor did Bellmawr Park or Levins request judgment to be entered in his favor as well.  On September 10, 2012, however, Mr. McCormick wrote a letter to the Court, which states as follows:

> Because I am not represented by an attorney I thought I should give you my side of the case. . . . After reading the plaintiffs [*sic*] deposition I found many lies.  He claims he cannot communicate or understand but when we went to the house he was able to answer all our questions by reading our lips and answer by jotting down notes to us.  I feel there was no wrongdoing on our part.  Mark Hibbert made a decision that turned out bad for him.  But it was his decision. So he wants us to pay for his mistake.  I've read the Motion for Summary Judgement [*sic*] and agree with Bellmawr Parks [*sic*] attorneys. Mark Hibbert was never forced to leave his home. He made the decision to move to Maine on his own. To the best of my knowledge everything [Bellmawr Park] has said in the Motion for Summary Judgement [*sic*] is true.  We agree and hope this ends soon so we can put this behind us and can finally enjoy our home.

[Docket No. 34.]<sup>6</sup>

The Court is cognizant of the fact that McCormick is a *pro se* litigant, and that the submissions of such parties are afforded a more liberal reading and interpretation.  See <u>Johnson v. City of Atl. City</u>, No.Civ.A.10-4386, 2012 U.S. Dist. LEXIS 182014, at *14-15 n.6 (D.N.J. Dec. 27, 2012) (internal citations omitted).  The Supreme Court has previously recognized, however, that "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel. . . . '[I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'"  <u>McNeil v. United States</u>, 508 U.S. 106, 113 (1993) (quoting <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826 (1980)).

Thus, despite appearing *pro se*, McCormick must nonetheless adhere to the requirements of the applicable Federal Civil Rules, which in this case is Rule 56 governing summary judgment. Rule 56 provides that:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

---

<sup>6</sup>    This letter was addressed to Judge Joel Schneider, the United States Magistrate Judge assigned to this case.

> fact and the movant is entitled to judgment as a
> matter of law. . . . A party asserting that a fact
> cannot be or is genuinely disputed must support the
> assertion by:
>> (A) citing to particular parts of materials in
>> the record, including depositions, documents,
>> electronically stored information, affidavits or
>> declarations, stipulations (including those made
>> for purposes of the motion only), admissions,
>> interrogatory answers, or other materials; or
>> (B) showing that the materials cited do not
>> establish the absence or presence of a genuine
>> dispute, or that an adverse party cannot produce
>> admissible evidence to support the fact.

Fed. R. Civ. P. 56.  While McCormick represents in his letter

that he agrees with the arguments set forth in the other

Defendants' summary judgment motion, he has not shown the Court

how these arguments apply to him.  Indeed, other than portraying

his own "side of the story" in his letter, McCormick has not

presented any evidence of his own to counter Plaintiff's claims

or show that there is no genuine issue of material fact that

judgment should be entered in his favor.  Further, the record

does not indicate that either Bellmawr Park or Levins have

consented to McCormick joining in their Motion for Summary

Judgment.

As such, while the Court is sympathetic to the fact that

McCormick may be unfamiliar with the law and civil motions

practice of this District, it is entirely his decision to

represent himself and he must nonetheless adhere to the

procedural rules of this Court in doing so.  Accordingly, to the

12

extent Defendant McCormick seeks summary judgment in his favor,
the Court will deny this request without prejudice.

## IV. DISCUSSION

In the instant Motion for Summary Judgment, Defendants
Bellmawr Park and Pat Levins move for judgment in their favor on
the entirety of Plaintiff's amended complaint.  More
specifically, Defendants assert that Plaintiff has not
established valid ADA or breach of contract claims, and that he
has not produced sufficient evidence for his remaining claims to
survive summary judgment.  In response, Plaintiff avers that his
claims are valid, and that the Court must deny summary judgment
because genuine issues of material fact remain disputed in the
record.  The Court considers each argument in turn below.

### A.   Plaintiff's Statute of Frauds and Fair Eviction Notice Act Claims (Counts III and V)

Hibbert initially argued that Bellmawr Park and Levins
violated New Jersey's Statute of Frauds with respect to the
circumstances surrounding the signing of the Mutual Ownership
Contract, as well as New Jersey's Fair Eviction Notice Act when
they forced him out of his home on March 7, 2010.  Plaintiff has
since, however, reconsidered these allegations, and concedes
that he does not have valid claims under either New Jersey
statute.  (Pl.'s Resp. Opp'n at 16, 18.)  Accordingly, judgment

13

will be entered in favor of Defendants with respect to these claims.

### B.   Plaintiff's ADA Claim (Count IV)

Plaintiff contends that Bellmawr Park and Levins, acting in her capacity as the property manager of Bellmawr Park, discriminated against him on account of his hearing impairment and failed to provide him with effective communication resources.  In response, Defendants argue that Plaintiff cannot establish a valid ADA claim because Bellmawr Park is not a "place of public accommodation" subject to the requirements of the Act.

Title II of the ADA prohibits discrimination in public services or public places based on an individual's disability. See Soto v. City of Newark, 72 F.Supp.2d 489, 492 (D.N.J. 1999); Cottrell v. Rowan Univ., 786 F.Supp.2d 851, 857 (D.N.J. 2011) (Hillman, J.).  In order to establish a violation of Title II, a plaintiff must show that he is: (1) a qualified individual with a disability, (2) excluded from participation in or denied the benefits of some service, program, or activity by reason of his disability; and (3) the entity which provides the service, program or activity is a public entity.  Soto, 72 F.Supp.2d at 493.  Neither party here disputes that Plaintiff can satisfy the

14

first two elements of a Title II discrimination claim.  Rather,
the dispute lies with the third element since Defendants aver
that Bellmawr Park is not a public entity or public place of
accommodation under the ADA.

Section 12182 of the ADA specifically provides that:

No individual shall be discriminated against on the
basis of disability in the full and equal enjoyment of
the    goods,    services,    facilities,    privileges,
advantages, or accommodations of any place of public
accommodation by any person who owns, leases (or
leases   to),   or   operates   a   place   of   public
accommodation.

41 U.S.C. § 12182(a).  A "place of public accommodation" is
defined in the Act as including an "inn, hotel, motel, or other
place of lodging."  42 U.S.C. § 12181(7)(A).  In Mitchell v.
Walters, No.Civ.A.10-1061, 2010 WL 3614210 (D.N.J. Sept. 8,
2010), the plaintiff claimed that her apartment complex
discriminated against her on the basis of disability when it
failed to accommodate her arthritis and diabetes.  Id. at *2.
The court, however, found that an apartment complex does not
fall within the definition of a "place of public accommodation"
under the ADA, as it is more permanent in nature than the
lodging and other transient housing covered by the ADA.  Id. at
*4.  In so finding, the court looked to Third Circuit dicta
stating that the ADA's legislative history indicated that
residential facilities, apartments, and condominium complexes
were not meant to be included in the definition of "places of

15

public accommodation" under the statute.  See id. (discussing Regents of Mercersburg Coll. v. Rep. Franklin Ins. Co., 458 F.3d 159, 165 n.8 (3d Cir. 2006); Indep. Housing Servs. of San Fran. v. Fillmore Ctr. Assocs., 840 F.Supp. 1328, 1344 (N.D. Cal. 1993)).

The holding of Mitchell is directly applicable to the instant case.  Bellmawr Park is a residential complex that provides low-cost housing and communal needs to families in southern New Jersey.  It does not constitute an inn, hotel, motel, place of lodging, or any other type of transient housing listed in the statute.  Indeed, Plaintiff himself has indicated that he has been a Bellmawr Park resident for a significant portion of his life.  Thus, Plaintiff's ADA claim against Bellmawr Park must fail.  Similarly, Plaintiff's claim against Defendant Levins is likewise invalid because, as the property manager of Bellmawr Park, she does not fall within the Act's definition of a "person who . . . operates a place of public accommodation."  41 U.S.C. § 12182(a).  Accordingly, judgment is entered in favor of Defendants Bellmawr Park and Levins on Plaintiff's ADA claim. [7]

---

[7]   Plaintiff contends that his ADA claim is valid because the Federal Public Housing Authority established Bellmawr Park.  It has previously been recognized that if a property receives federal funding, a suit may be converted into a federal action based on the receipt of federal funds.  See Mitchell, 2010 WL 3614210 at *4 (citing Reyes v. Fairfield Prop., 661 F.Supp.2d

C.   **Plaintiff's NJLAD Claim (Count II)**

Similar to the ADA, the NJLAD likewise prohibits discrimination against a disabled person.  Unlike the ADA, however, the NJLAD is broader and can encompass actions against certain non-public entities.  See Estate of Nicolas v. Ocean Plaza Condo. Assoc., Inc., 909 A.2d 1144 (N.J. Super. 2006)(applying NJLAD to private condominium complex); see also Fowler v. Borough of Westville, 97 F.Supp.2d 602 (D.N.J. 2000) (Irenas, J.)(holding that recovering alcoholics could maintain

_____

249, 264 n.5 (E.D.N.Y. 2009)).  While it is true that the federal government initially created Bellmawr Park in the New Deal Era to assist defense workers building navy ships in Camden, New Jersey, the record reflects that the government conveyed the property to Bellmawr Park Mutual Housing Corporation – a private non-profit corporation – in 1952. Merely because Bellmawr Park was initially created with public funds over fifty years ago does not transform Plaintiff's cause of action into a valid ADA claim.

Plaintiff further argues that his ADA claim should survive summary judgment because Appendix II to the ADA provides that: "[c]onsistent with the [] Act's purpose of reinstating a broad scope of protection under the ADA, the definition of 'disability'. . . shall be construed broadly in favor of expansive coverage[.]" (Pl.'s Resp. Opp'n at 10-11 (citing *Appendix II, Part 1630-I Interpretive Guidance on Title I of the Americans With Disabilities Act*).)  This language, however, is found in the Act's Appendix accompanying Title I of the ADA. Plaintiff's claim against Defendants is based on Title II.  As such, Plaintiff's citation to this language is inapplicable here.  Moreover, even if the Court were to consider it, this language only indicates that the definition of a "disability" should be broadly construed.  It says nothing regarding an expansive definition of "public entity."  Neither party here disputes that Hibbert is disabled. Rather, the point of contention is whether Defendants are persons or entities covered by the Act.

NJLAD claim alleging that police sought to drive them from their private housing, even though no claimant had been actually evicted).

The NJLAD provides that:

> All persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of . . . real property[8] without discrimination because of . . . disability[.]

N.J.S.A. § 10:5-4.  The Act goes on to specifically state that it is unlawful to:

> discriminate against any person or group of persons because of . . . disability . . . in the terms, conditions or privileges of the sale . . . of any real property[.]

N.J.S.A. § 10:5-12(g)(2).  The Administrative Code accompanying the Act further indicates that "[i]t is unlawful for any person to . . . [r]efuse to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford a person with a disability equal opportunity

---

[8]  "Real property" is defined in the Act as:

> [R]eal estate, lands, tenements and hereditaments, corporeal and incorporeal, and leaseholds, provided, however, that, except as to publicly assisted housing accommodations, the provisions of this act shall not apply to the rental: (1) of a single apartment or flat in a two-family dwelling, the other occupancy unit of which is occupied by the owner as a residence; or (2) of a room or rooms to another person or persons by the owner or occupant of a one-family dwelling occupied by the owner or occupant as a residence at the time of such rental.

N.J.S.A. § 10:5-5(n).

to use and enjoy a dwelling." N.J.A.C. § 13:13-3.4(f). By the same token, however, it has also been recognized that "a duty to provide a reasonable accommodation for a resident with a disability does not necessarily entail the obligation to do everything possible to accommodate such a person." Shearn v. Victoriana Condo. Assoc., 2011 N.J. Super. Unpub. LEXIS 2877 (App. Div. Nov. 23, 2011)(internal citations omitted).

The Third Circuit has recognized that New Jersey courts typically look to federal anti-discrimination laws for guidance when construing NJLAD claims. See Chisolm v. McManimon, 275 F.3d 315, 325 n.9 (3d Cir. 2001) (citing Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 70 (3d Cir. 1996)). In so doing, courts usually refer to the provisions of the ADA or § 504 of the Federal Rehabilitation Act ("RA") of 1973. See Chisolm, 275 F.3d at 325 n.9 (looking to the ADA for guidance); Borngesser v. Jersey Shore Med. Ctr., 774 A.2d 615, 621 (N.J. Super. 2001) (relying on § 504 of the RA); Hall, 777 A.2d at 1009 ("For the purpose of this analysis, there are no significant distinctions between the RA and LAD claims."); Cottrell v. Rowan Univ., 786 F.Supp.2d 851, 857 (D.N.J. 2011) (Hillman, J.). Federal law requires entities to take appropriate steps to ensure that communication with a disabled person is as effective as communication with others that are not disabled. Chisolm, 275 F.3d at 325 (citing 28 C.F.R. §

19

35.160(a)) (discussing Federal Regulations with respect to the
ADA). With respect to disabled individuals suffering from
deafness, this typically requires the furnishing of an
"appropriate auxiliary aid." Id. at 326. The Code of Federal
Regulations identifies the following programs and services as
recognized auxiliary aids:

> Qualified interpreters, notetakers, transcription
> services, written materials, telephone handset
> amplifiers, assistive listening devices, telephone
> compatible with hearing aids, closed caption decoders,
> open and closed captioning, telecommunications devices
> for deaf persons (TDDs), videotext displays, or other
> effective methods of making aurally delivered
> materials available to individuals with hearing
> impairments.

28 C.F.R. § 35.104(1). The Regulations further indicate that
primary consideration should be given to the requests of the
disabled individual in determining which auxiliary aid or
service is necessary, and that, although written materials may
be sufficient for effective communication in some instances, a
qualified interpreter may be necessary if the information at
issue is particularly complex. 28 C.F.R. § 35.160(b)(2); id.
Pt. 35, App. A. Further, the entity should bear the cost for
providing the reasonable accommodation. See Soto v. City of
Newark, 72 F.Supp.2d 489, 496 (D.N.J. 1999).

Federal law, however, only requires that "appropriate"
auxiliary aids be provided; it does not "mandate services which
produce the identical result or level of achievement for

20

handicapped and non-handicapped persons[,] so long as they afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit in the most integrated setting appropriate to the person's needs." Borngesser, 774 A.2d at 622-23 (citing 45 C.F.R. § 84.4(b)(2)) (internal quotations and ellipsis omitted). Further, "[w]hat auxiliary aids would be required is a fact-sensitive issue that must be considered within the parameters of what is meant by 'effective communication.'" Borngesser, 774 A.2d at 623. The New Jersey Superior Court has indicated that there is no singular definition of "effective communication." Id. at 624 (internal string citation omitted). Rather, as noted by the Third Circuit, "the effectiveness of auxiliary aids and/or services is [typically] a question of fact precluding summary judgment." Chisolm, 275 F.3d at 326.

In Chisolm v. McManimon, the plaintiff, a deaf individual, was arrested and taken to a detention center for holding purposes. Id. at 317. At the detention center, the plaintiff requested an ASL interpreter, a telecommunications devices for deaf persons (TDD), or that his hearing roommate be contacted. Id. at 318. He was denied these aids and services, and therefore attempted to communicate through notes and lipreading. Id. The detention center eventually placed him in a cell with a television equipped with closed captioning, but did not activate

21

the service for him.  Id.  While the defendants eventually permitted the plaintiff to use his TDD, he did not receive it until several days into his detention.  Id.  The plaintiff therefore filed suit against the detention center, alleging that it discriminated against him by failing to reasonably accommodate his disability.  The detention center argued, *inter alia*, that, although the plaintiff was not provided with the auxiliary aid of his choice, he was nonetheless able to effectively communicate through notewriting and lipreading.  In support of its argument, the defendants highlighted that the plaintiff confirmed in his deposition that detention personnel did everything he requested in writing.  Id. at 327, 328.  In assessing the discrimination claim, the Third Circuit found that:

> Chisolm presented evidence indicating that ASL was his
> primary language of communication and that he was not
> proficient in either lipreading or written English.
> From this evidence, a reasonable trier of fact could
> infer that these alternative aids were ineffective. .
> . . [Moreover,] [w]hile [Chisolm's] statement [in his
> deposition] may influence a trier of fact's assessment
> of whether the pad of paper and pencil were effective
> auxiliary aids, it does not show their effectiveness
> as a matter of law.  Necessarily, Chisolm's ability to
> make written requests was dependent upon his ability
> to write in English.  When considered in a light most
> favorable to Chisolm and taken together with the
> evidence that Chisolm is not proficient in written
> English, the deposition statement is not dispositive
> of the issue of effectiveness.

Id. at 328-29.

In this case, Plaintiff asserts that he is unable to understand and communicate proficiently in the English language, and that his native language is ASL.[9]  (Hibbert Dep. 58:21-24.) He also does not know how to read lips.  (Id. at 143:24-25.) Further, while he has previously utilized note taking, written materials, and certain types of videotext displays as auxiliary aids, he has testified he only uses these methods to transcribe and interpret short messages and thoughts.  (Id. at 58:3-10 ("Q: Are you able to read and write in the English language? A: I don't fully understand the English language.  Q: Are you able to write down sentences to compose your thoughts? A: Simple words, I surely can, but nothing complicated.").)  During important events or situations involving complex information, Hibbert

---

[9]   Although ASL is related to the English language, it is unique in nature.  As noted by a law review article cited by the Superior Court of New Jersey:

> Although derived from English, ASL is a distinct language "with a separate historical tradition, and separate morphological and syntactic principles of organization."  For example, while an English speaking person might ask "[h]ave you been to San Francisco?," an ASL user might sign ""[t]ouch San Francisco already you?"" While an English speaking person might ask, "What are your hobbies?," an ASL user might sign, "Time off do do do?"  Moreover, ASL is based on a limited number of signs representing primarily concrete terms, and thus the average ASL user has a limited knowledge of English words.

Borngesser, 774 A.2d at 618 n.1 (citing Bonnie Poitras Tucker, Access to Health Care For Individuals with Hearing Impairments, 37 Hous. L.R. 1101, 1105-06 (2000) (footnotes omitted)).

avers that he always requests that an ASL interpreter be present: "If there is anything legal, or court, police, landlord, dentist [related], then I request an interpreter."[10] (Id. at 148:14-16.)  Moreover, while several members of his family have previously assisted him in translation throughout his life, none of them are certified ASL interpreters.  (Id. at 67:21-68:23, 165:17-21, 167:22-23; see also Mark Jr. Dep. 20:24-21:6 ("Q: Did you ever translate for your father during the normal course of his daily activities? . . . A: Not like all the time, but like rarely. . . . When I necessarily had to.").)

Hibbert has not precisely identified when and where Defendants denied him a reasonable accommodation.  However, in viewing the record in the light most favorable to him, the only relevant events during which Hibbert may have been denied a reasonable accommodation would be the December 2009 meeting with the Board of Trustees and the events surrounding the departure from his home on March 7, 2010.[11]  The Court must therefore

---

[10]   Indeed, an ASL interpreter was present during Plaintiff's deposition.

[11]   At various points throughout the record, Hibbert avers that he was taken advantage of because of his disability.  For example, at his deposition, he indicated that he was very confused and overwhelmed when he initially signed the Mutual Ownership Contract in the presence of his mother, aunt, and Levins. (Hibbert Dep. 66:6-67:22, 70:15-71:9.) These other instances of alleged discrimination, however, are irrelevant here because they are not correlated to Plaintiff's alleged

determine if any genuine issues of material fact exist as to whether Bellmawr Park and Levins discriminated against him on these occasions by failing to reasonably accommodate his disability.

Prior to the December 1, 2009 meeting with the Board of Trustees, Defendant Levins sent Plaintiff a letter advising him to bring an interpreter to the meeting. (See Defs.' Mot. Summ. J., Ex. G ("You are requested to attend the next meeting of the Board of Trustees on Tuesday, December 1, 2008 at 7:00 pm, to discuss your house. Please bring someone to translate for you.").)[12] According to Hibbert, upon receiving the letter, he asked his daughter to explain it to him. (Id. at 168:14-169:13, 170:3-6.) He objected to the request to bring an interpreter because he believed federal law required Bellmawr Park to supply

---

forced eviction of his home — the basis of his current discrimination claim. Accordingly, the Court does not discuss them here.

Plaintiff also asserts in his deposition and papers that he felt as though his son Mark Jr. took advantage of him when he did not accurately translate and relay important information to him. Mark Jr., however, is not a party to the instant proceedings, nor does the record reflect that Plaintiff has chosen to pursue any civil or criminal suit against him. As such, except to the extent that it may affect the instant dispute, the Court will not discuss the legal implications of Mark Jr.'s conduct here.

[12] Although the text of the letter instructs Plaintiff to bring an interpreter to the December 1, 2008 meeting, it is dated November 20, 2009. Thus, the Court will assume that the 2008 date was a typographical error.

the auxiliary aid, and he felt as though he should not have to bear the cost of an interpreter's services.  (Id. at 171:15-23.) The record is in dispute as to whether or not Hibbert actually requested the presence of an ASL interpreter prior to the meeting. (Compare id. 166:18-21 with 168:19-23; see also Mark Jr. Dep. 15:15-19.)  Hibbert avers that he contacted an interpreter agency, but it informed him that a request for interpretive services had to come from Bellmawr Park.  (Hibbert Dep. 167:16-18.)  Plaintiff nonetheless attended the meeting in December without an interpreter, but asked his son to advise the Board that he wished to have an interpreter present before the meeting commenced.  (Id. at 175:5-16.)  Plaintiff does not know whether such a request was actually made, however, because he cannot hear.  (Id. at 175:9-12.)  While Mark Jr. and Defendants aver that Hibbert approved his son to translate for him, (Mark Jr. Dep. 15:7-12, 15:25-16:4; Levins Dep. 50:12-18), Hibbert claims that he objected because Mark Jr. is not an ASL certified interpreter.  (Id. at 167:19-23, 175:14-25.)

When viewed in totality, this evidence raises genuine issues of material fact as to whether or not Hibbert was denied a reasonable accommodation at the December 2009 meeting that initiated his departure from Bellmawr Park.  Notably, it remains unclear whether an interpreter was actually requested to be

present at the meeting, and whether such a request was denied. It is likewise disputed whether Hibbert consented to have Mark Jr. translate for him in lieu of a certified ASL interpreter. Even if his translation was not disputed, however, reasonable minds could differ as to whether Mark Jr.'s services were an effective means of communication such that Hibbert had an equal opportunity to participate in the meeting.  As discussed above, Third Circuit precedent indicates that, even though alternative auxiliary aids may be available, a qualified interpreter may nonetheless be necessary if the information at issue is particularly complex.  Chisolm, 275 F.3d at 326 (citing 28 C.F.R. Pt. 35, App. A.)  A reasonable juror could find that a Board of Trustees meeting regarding the sale of one's home constitutes such a situation calling for a qualified interpreter.  Even further, New Jersey courts have noted that the effectiveness of a family member's interpretive services may be undermined in cases involving complicated and emotional matters, because the family member may withhold certain information so as to protect the disabled person's emotional stability.  See Borngesser, 774 A.2d at 615; Hall, 777 A.2d at 1002-1007.  Thus, when taking all of this into account, summary judgment is inappropriate at this time.

The Court next considers whether Defendants failed to reasonably accommodate Hibbert during the events surrounding the move out of his home on March 7, 2010.  According to his son, Hibbert made up his mind to sell the property on March 5, 2010, and Mark Jr. therefore immediately contacted Defendant Levins to inform her of Hibbert's decision.  (Mark Jr. Dep. 33:16-35:13.) Hibbert contends, however, that he never agreed to have Mark Jr. serve as his interpreter during the move-out process, and that his son withheld important relevant information from him:

> Pat never discussed any of this with me.  It was never between Pat and I.  It was always between Pat and my son, and Pat never had permission to go through my son or to have this conversation with my son.  This conversation should have happened with me.

(Hibbert Dep. 179:15-20.)  According to Plaintiff, Defendants took advantage of his disability and unlawfully evicted him because he was not able to effectively communicate with Levins. It remains unclear, however, whether he actually requested that a qualified interpreter be present on that day.

In response, Defendants assert that Plaintiff's own actions contradict his allegation that he was a victim of discrimination, and that his account of the events in question are highly contradictory.  Defendants point out that Plaintiff applied for a loan (presumably to assist in the purchase of property in Maine) and signed a form indicating that he was

28

relocating to Wells, Maine.  Defendants also argue that Hibbert called numerous family members prior to the day of the move requesting their help, reserved a moving truck, and accepted the $20,000 check for the purchase of his home.  Defendants further aver that Hibbert in fact was able to effectively communicate with Levins that day through handwritten notes and translation by his present family members.

Although it is a close call, the Court finds that summary judgment is inappropriate on this point.  There are simply too many unsettled facts surrounding Hibbert's communications during the move in order for the Court to decide as a matter of law that Defendants did not discriminate against him by failing to reasonably accommodate his disability.  While it is true that Plaintiff contradicts himself several times throughout the record, this may at least be to some degree a result of his inability to readily understand the English language.  Moreover, although a reasonable juror could certainly find that his actions imply that he planned to move out of his home, it is not entirely clear from the record that he wanted to do so, let alone only two days after giving his alleged consent to sell his property.  Indeed, Hibbert testified that:

> A: Pat called my son, not me.  I didn't know.  That
> was March 6th at 9:00 at night.  And I have proof of
> that call.  I didn't know about it.  Pat called my son

and said, "make sure you're out by tomorrow morning at
9," but no one ever communicated that to me.

      . . .

Q: Did you know on March 6, 2010 that you had to be
out the next day? Is that what you're telling us?

A: I didn't know. . . . [M]y son arrived at my house,
and [] told me that I had to be out by 9:00 the next
morning.  . . . So I started calling around and ask
for help to pack and move all night.  I was up all
night long[.]

(Hibbert Dep. 177:12-178:9.)  Mark Jr. also acknowledged several

times during his deposition that his father never really wanted

to move to Maine, but felt as though he had to do so:

Q: Well, did your father ever tell you that he wanted
to move to Maine?

A: No.

Q: No?

A: No.

Q: But he ended up in Maine . . . in March of 2010,
correct?

A: Right.

Q: . . . But he never told you he wanted to move to
Maine?

A: No.

. . .

Q: Well, did you ever hear that your dad wanted to
move to Maine in January or February?

A: No.

. . .

Q: Is it fair to say you knew that day that your dad
at some point wanted to move to Maine?

A: I guess.  I mean he never really wanted to, but –
that's what he told me.  But I mean -

(Mark Jr. Dep. 19:10-24, 46:21-23, 47:16-19.)

A reasonable juror might also question the circumstances
regarding the conveyance of the $20,000 check and what
relationship it had to the undocumented purported sale of
Plaintiff's interest in the property.  In viewing these facts in
conjunction with the evidence that Hibbert is not proficient in
English, a reasonable juror could find that Defendants
potentially took advantage of his disability.  A reasonable
factfinder could also find that the presence of a qualified ASL
interpreter, or some other type of acceptable auxiliary aid, may
have significantly alleviated the confusion surrounding the
move, and thus may have prevented the uncertain and perhaps
chaotic events of March 7, 2010.  While the Supreme Court has
held that sign language interpreters are not required when
lipreading and other aids are sufficient, whether such other
accommodations are effective "is a fact-sensitive issue that
must be considered within the parameters of what is meant by
'effective communication.'"  Borngesser, 774 A.2d at 623 (citing
Bd. of Educ. of Hendricks Hudson Cent. Sch. Dist. v. Rowley, 458
U.S. 176, 210 (1982)).

As to Defendants' argument that Hibbert could effectively
communicate with Levins through written notes and his family

31

members on the day of the move, "[t]he most obvious problem with this argument is that it conflicts with the regulatory mandate that . . . a disabled person's choice of auxiliary aid or service" be honored.  Chisolm, 275 F.3d at 326.  Merely because Hibbert could communicate through these methods does not mean that they were his chosen methods of communication.  Indeed, Hibbert testified that he always requested that a qualified ASL interpreter be present for important events, and he "didn't realize that [] being thrown out meant something legal was going on" during his alleged forced eviction.  (Hibbert Dep. 149:1-2.)  Further, Levins acknowledged in her deposition that she previously communicated with Hibbert through other methods besides note taking and family translation, including the use of a TTY. (Levins Dep. 39:18-41:6.)  There is nothing in the record explaining why such an alternative service previously used by Plaintiff could not be furnished on the day of the move.  Moreover, regardless of whether Hibbert was able to communicate with Defendants through his notes and family members, it is within the province of a jury to determine whether these alternative methods of communication were actually effective.  As the Third Circuit indicated in Chisolm, "[w]hile this [] may influence a trier of fact's assessment of whether the pad of paper and pencil were effective auxiliary aids, it does not show their effectiveness as a matter of law. . . . Generally, the

effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."  275 F.3d at 326, 328-29 (internal citations omitted).

Accordingly, given that genuine issues of material fact remain in the record as to whether Hibbert could effectively communicate with Defendants and whether they failed to reasonably accommodate his disability, the Court will deny summary judgment on the NJLAD claim at this time.

### D.   Plaintiff's Breach of Contract Claim (Count I)

Hibbert asserts that Defendants breached the Mutual Ownership Contract when they "wrongfully and unlawfully removed, evicted and dispossessed Plaintiff and his family" from the 506 West Browning property in March of 2010.  (2d Am. Compl. at 3.) Plaintiff avers that, as a result of Defendants' breach, he and his family were forced to move out of their home and incurred substantial expenses.  (Id.)  In turn, Defendants move for judgment in their favor on the grounds that no evidence exists to show that they breached an obligation that they supposedly owed to Hibbert.  (Defs.' Mot. Summ. J. at 31.)

Under New Jersey law, a breach of contract claim requires proof of three elements: (1) the existence of a valid contract, (2) defective performance by the defendant that resulted in a

breach, and (3) resulting damages.  MacWilliams v. BP Prods. N.A., No.Civ.A.09-1844, 2010 U.S. Dist. LEXIS 124727, at *16 (D.N.J. Nov. 23, 2010) (Kugler, J.) (citing Coyle v. Englander's, 488 A.2d 1083, 1088 (N.J. Super. 1985)); see also Peters v. U.S. HUD, No.Civ.A.04-06057, 2006 U.S. Dist. LEXIS 4727, at *10 (D.N.J. Feb. 1, 2006) (Kugler, J.) (internal citations omitted).  "Under principles of contract law[,] the construction and legal effect of an unambiguous writing is for the court and not for a jury.  Summary judgment may be entered in a case where the court is asked to construe contractual clauses that are clear and unambiguous despite the parties' differing views as to what consequences flow from those provisions."  United States v. Bills, 639 F.Supp. 825, 829 (D.N.J. 1986) (citing Cnty. of Erie v. Am. States Ins. Co., 573 F.Supp. 479, 483 (W.D. Pa. 1983); Wagman v. Carmel, 601 F.Supp. 1012, 1014 (E.D. Pa. 1985)).

Neither party here disputes that the Mutual Ownership Contract at issue constitutes a valid contract.  Rather, the parties' contentions lie with the second and third elements of the contract claim, i.e., whether Defendants breached the agreement and Plaintiff suffered damages as a result.  A valid contract is deemed breached if one of the parties to the agreement does not fulfill a contractual obligation that it owes

34

to the other party under the contract.  <u>Bills</u>, 639 F.Supp. at
829.  Further, "[t]o prove resulting damages, a plaintiff must
prove that he suffered a quantifiable loss that was 'the natural
and probable consequence[]' of the defendant's breach."
<u>MacWilliams</u>, 2010 U.S. Dist. LEXIS 124727 at * 16.  The Supreme
Court of New Jersey has interpreted this to require proof that
the plaintiff's alleged damages were "a reasonably certain
consequence of the breach" at the time that the parties
contracted.  <u>Id.</u> (quoting <u>Totaro, Duffy, Cannova & Co., LLC v.
Lane, Middleton & Co., LLC</u>, 921 A.2d 1100, 1108 (N.J. 2007)).

Hibbert avers that Defendants breached two provisions of
the Mutual Ownership Contract.  The first provision, Paragraph
5, states in relevant part as follows:

> 5. The Member shall occupy the dwelling covered by
> this Contract as a private dwelling for himself and
> his immediate family, and may enjoy the use . . . of
> all community property and facilities of the Project,
> so long as he remains a Member of the Corporation[,]
> occupies the dwelling, and abides by all terms of this
> Contract.

(Defs.' Mot. Summ. J., Ex. B, ¶ 5.)  The second provision
of the Mutual Ownership Contract upon which Plaintiff bases
his breach of contract claim, entitled Paragraph 18:
Peaceable Possessions, provides:

> If the Member makes the payments herein required
> and performs all of the conditions and agreements
> of this Contract, the Corporation covenants that

at all times while this Contract remains in full
force and effect, the Member may peaceably have
and enjoy for his sole use and benefit the
property herein described, and may enjoy use . .
. of all community property and facilities[.]

(Id. ¶ 18.)  Hibbert relies on these two contractual provisions
to argue that Bellmawr Park was obligated to allow him to
peaceably use and enjoy 506 West Browning without interference,
so long as he remained a member of the complex and paid his
rent.  According to Hibbert, Defendants violated this obligation
when they "creat[ed] circumstances by which [he] felt coerced to
leave and could no longer occupy his dwelling[.]"  (Pl.'s Resp.
Opp'n at 17.)

As discussed in detail with respect to Plaintiff's NJLAD
claim, the alleged "pandemonium" that occurred during the move
is reflected in the chaotic factual record before the Court.
While on the one hand Hibbert reserved a moving truck, signed a
"move-out" form, and requested the assistance of his friends and
family, (see Defs.' Exs. N & O; Hibbert Dep. 139:22-140:21), he
and his son both testified that he never wanted to move to Maine
and felt coerced to do so.  (Id. at 63:21-22, 149:18-150:15;
Mark Jr. Dep. 19:10-24, 46:21-23, 47:16-19.)  Plaintiff also
testified that he learned that he needed to evacuate the
premises one day before the move, and stayed up all night
packing.  (Hibbert Dep. 177:12-178:9.)  He also repeatedly
indicated that he felt extremely overwhelmed and confused during

36

the move-out process due to his inability to hear and communicate in the English language, which probably could have been alleviated through the use of a qualified interpreter or some other appropriate auxiliary aid.  (Id. at 44:14-17, 63:13-22, 141:18-143:23, 144:22.)

As a result of this disjointed factual record riddled with discrepancies, the Court cannot exclude the possibility that a reasonable juror could find that Defendants created, or least contributed to, circumstances under which Hibbert felt coerced to leave.  In viewing the record in the light most favorable to Plaintiff, the Court cannot hold as a matter of law that Defendants did not interfere with Plaintiff's peaceful use and enjoyment of his property on that day.[13]  As such, summary judgment on the breach of contract claim is likewise denied, and the resolution of this matter is left to the reasonable judgment of a jury of Hibbert's peers.

### E.   Plaintiff's Fair Housing Act Claim (Count VI)

---

[13]   Given that the Court finds that genuine issues of material fact are present in the record with respect to the second element of the breach of contract claim, i.e., whether Defendants breached their contractual obligations, the Court need not reach the issue of whether Plaintiff was damaged as a result of the purported breach.  We note that if the defendant was coerced to leave his home that monetary damages associated with the move would have been a likely consequence.

The Fair Housing Act ("FHA") was designed to "provide, within constitutional limitations, for fair housing throughout the United States." Eastampton Ctr., LLC v. Twp. of Eastampton, 155 F.Supp.2d 102, 116 (D.N.J. 2001) (quoting 42 U.S.C. § 3601). With respect to disabled individuals, the FHA specifically states as follows:

> It shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person.

42 U.S.C. § 3604(f)(2)(A). The FHA further provides that the term "discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(B). A violation of the FHA may be established by showing that the challenged action was either: (1) motivated by intentional discrimination, or (2) resulted in a discriminatory effect, even absent evidence of a discriminatory motive. Eastampton, 155 F.Supp.2d at 110 (internal citations omitted); see also Torres v. Franklin Twp., No.Civ.A.09-6282, 2011 WL 6779596, at *6 (D.N.J. Dec. 22, 2011) (Rodriguez, J.) (internal citations omitted).

Hibbert avers that: "Defendants Bellmawr Park and Levins created circumstances under which Plaintiff, due to his

38

deafness, was unable to effectively communicate with Defendants and others or properly deal with the circumstances which were presented to him in the twenty-four to forty-right hours leading up to his move from his property on March 7, 2010[.]" (Pl.'s Reply at 18-19.)  In response, Defendants assert that Hibbert has failed to provide any credible evidence to support his assertions. (Defs.' Mot. Summ. J. at 35-36.)

Hibbert's FHA claim is essentially a re-characterization of his NJLAD and breach of contract claims.  As expressed above, the record is too unclear for the Court to conclude as a matter of law that Defendants did not discriminate against Hibbert by failing to reasonably accommodate his disability during the move.  Based on the evidence, a reasonable trier of fact could find that Defendants' alleged failure to accommodate Hibbert's disability interfered with the use and enjoyment of his home, and contributed to his belief that he was being forced from his home.  Accordingly, summary judgment on this claim is inappropriate at this time.

## V.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted in part and denied in part. More specifically, judgment will be entered in Defendants' favor on the ADA, Statute of Frauds, and Fair Eviction Notice Act

claims.  Summary judgment is denied, however, with respect to
the NJLAD, breach of contract, and FHA claims.

    An appropriate Order follows.


                                           */s/ Noel L. Hillman*

At Camden, New Jersey             NOEL L. HILLMAN, U.S.D.J.

DATED:  03/28/2013