UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

MARK E. HIBBERT,                    :
                                    :
                                    :      Civil No. 10-5386 (NLH)
          Plaintiff,                :
                                    :
     v.                             :
                                    :
                                    :      **OPINION**
BELLMAWR PARK MUTUAL HOUSING        :
CORPORATION, PAT LEVINS, and        :
BOB McCORMICK,                      :
                                    :
          Defendants.               :
_____:

**APPEARANCES:**

BARRY J. BERAN, ESQUIRE
BERAN & BERAN, ESQS.
BUILDING C - SUITE ONE
102 BROWNING LANE
CHERRY HILL, NJ 08003
     *Attorney for Plaintiff Mark E. Hibbert, Sr.*

WILLIAM J. MARTIN, ESQUIRE
MARTIN, GUNN & MARTIN
216 HADDON AVENUE
SUITE 420
WESTMONT, NJ 08108
     *Attorney for Defendants Bellmawr Park Mutual Housing
     Corporation and Pat Levins*

JOSEPH M. FEENEY
BROWN & CONNERY
6 NORTH BROAD STREET
WOODBURY, NJ 08096
     *Attorney for Defendant Bob McCormick*

**Hillman, District J.**

     Currently pending before the Court are Motion and

Supplemental Motion for Summary Judgment of defendant Bob

McCormick, and Second Motion for Summary Judgment[1] filed by
defendants Bellmawr Park Mutual Housing Corporation and Pat
Levins ("Bellmawr Park Defendants").  For the reasons that
follow, the Motions will be granted.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Hibbert, who is deaf, was a resident of Bellmawr Park, a
non-profit corporation that provides low-cost housing in
southern New Jersey.  Bellmawr Park owns the housing project,
but neither sells nor rents any of the homes to individual
members.  A resident enters into a "Mutual Ownership Contract"
in which the resident agrees to purchase a right of perpetual
use of the dwelling and pay low monthly payments to Bellmawr
Park.  A resident may surrender the dwelling back to Bellmawr
Park, and may sell any improvements he made to the dwelling.

In 2009, Plaintiff expressed an intent to sell the house
and move to Maine with his wife, who is also deaf, and two
children.  Plaintiff met with the Bellmawr Park Board of
Trustees on December 1, 2009 to discuss his intent to sell his
home and terminate his membership in Bellmawr Park.  Hibbert's

---

[1]     Defendants were granted leave to file renewed motions for
summary judgment.

[2]     The factual background, at that time, was summarized by the
Court in its Opinion entered on March 28, 2013.  Those facts
pertinent to the pending motions will be repeated here, along
with additional facts presented by the parties.

teenage son, Mark Hibbert Jr. ("Mark Jr."), served some role as his interpreter during the meeting.  Defendant Levins and several other members of the Board also attended the meeting. According to Plaintiff, he requested that a sign language interpreter be present, but one was not provided.  Hibbert maintains that he is unsure of what actually occurred at the meeting because he could not hear and was unable to understand. He also contends that he never made a firm commitment to sell his interest in his property and move to Maine.

Following the December 2009 meeting, defendant Robert McCormick was contacted by Levins who told him that Hibbert wanted to sell his home and its improvements.  Following this initial contact, McCormick and Hibbert engaged in some form of communications regarding the sale of the property over the course of several months.[3]  During these conversations, Mark Jr., at the time a minor, served as the intermediary and interpreter.

Hibbert also made inquiries about properties in Maine.  In February of 2010, he applied for a loan in the amount of $124,000 from Peoples United Bank.  On the loan application, Hibbert listed his contact address as "Maine, TBD."  In early March of 2010, the Bank denied the request for the loan.

---

[3]    Plaintiff contends that McCormick visited the property uninvited and was aggressively pursuing the opportunity to buy Hibbert out.

During supplemental discovery, Defendants obtained documents regarding the purchase of a home by Hibbert in Maine.[4] On January 21, 2010, Hibbert signed a Purchase and Sale Agreement for the purchase of a mobile home property at 2196 Sanford Road, Lot 28, Wells, Maine.  On February 1, 2010, Hibbert entered into an Addendum to that agreement executed on February 24, 2010.

However, it appears that Hibbert changed his mind about wanting to buy 2196 Sanford Road at some point between executing those agreements and March 3, 2010.  During supplemental discovery, Plaintiff's real estate agent, Donna DuBois Miller, was deposed and testified that Plaintiff emailed her stating that he no longer wanted to go through with the deal.  She also testified that on March 3, 2010, she emailed Hibbert advising him that the sellers were very upset with Hibbert's intentions to back out of the sale of 2196 Sanford Road, that he would lose his deposit, and that they were considering taking legal action

---

[4]     Some documents were obtained from the Maine Human Rights Commission (MHRC).  Hibbert had filed a complaint with the MHRC, as well as with HUD alleging he was discriminated against at the closing for the purchase of a home located at 2196 Sanford Road, Wells, Maine.  Hibbert also filed complaints with the MHRC and HUD alleging he was discriminated against by Pine Tree Estate Mobile Home Park, located in Maine, for their failure to sell him a mobile home.  However, allegations made in those complaints, as well as the decisions in those matters, are not before the Court and, therefore, will not be considered.

against him, including payment of legal fees.  She further testified that as of that date, she considered the sale of 2196 Sanford Road to be "dead."

Nonetheless, following that email, on March 5, 2010, Mark Jr. contacted Levins to inform her of his father's intent to sell the Bellmawr property and vacate the premises.  Although the date of his signature is in contention, at some point Hibbert had signed a "move-out form" which indicated that he was moving and provided an address in Wells, Maine for future contact purposes.

On March 7, 2010, Hibbert received a check in the amount of $20,000[5] from McCormick.  Hibbert originally told the Court that he did not know what the check was for, that it was handed to him in an envelope on the day he moved out, and that he had neither negotiated nor entered into any agreement to sell his interest in the property.  He admitted depositing the check into his bank account on March 8, 2010, but states that he did so for "safekeeping."   However, during supplemental discovery, it was

---

[5]    The Court noted in its previous opinion that, at that time, "there are no documents in the record establishing the purpose of the check, or any other documents memorializing the purported sale of Hibbert's interest in the property."  The record has since been supplemented to show that the check was compensation for Hibbert's improvements to the property and that the funds from the check were used as a down payment for the residence he purchased in Maine a day later.

determined through the testimony of Dubois Miller that Hibbert needed $17,000 in order to close on the Maine property.

On March 7, 2010, Plaintiff and his wife moved out of Bellmawr Park. Plaintiff hired a moving truck to assist with the move and spent the night packing. Approximately eleven individuals were present during the move, including Levins and several members of Plaintiff's family. According to Levins, all of Plaintiff's belongings were packed and ready to move out that morning, and she communicated with him during the move primarily through handwritten notes.

On March 8, 2010, Plaintiff attended a closing to purchase 2196 Sanford Road in Wells, Maine. During supplemental discovery, DuBois Miller testified that Hibbert did not have certified funds available at the closing, but that he had deposited a check that morning. She stated that Hibbert went to the bank that day to withdrawal $17,000 from funds he just deposited. Hibbert also signed a HUD-1 Settlement Sheet for the purchase of 2196 Sanford Road and obtained a Bill of Sale. Hibbert also executed a Promissory Note and a Security Agreement. DuBois Miller further testified that following the closing, she accompanied Hibbert to 2196 Sanford Road, Lot 28, Wells, Maine at which time he moved in with his family.

Hibbert claims that he was unlawfully evicted and forced to move out of his home in New Jersey on March 7, 2010, and that

6

Levins, McCormick, and Mark Jr. took advantage of his disability and engaged in some sort of scheme to acquire his property. He points to the hurried nature of the move, McCormick's aggressive pursuit of the property, his minor son's contacts with the Defendants, the overall lack of communication and confusion stemming from his disability, the "unexplained" check provided just two days before he vacated the premises in an amount below the value of the improvements, and the absence of any documents memorialized a conveyance of an interest in the property as evidence that Defendants took advantage of him and forced him from the property.

Hibbert filed an amended complaint asserting the following counts against Defendants: (1) breach of contract; (2) violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A § 10:5-12 et seq.; (3) violation of the New Jersey Fair Eviction Notice Act, N.J.S.A. § 2A:42-10.15 et seq.; (4) violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.; (5) violation of the New Jersey Statute of Frauds, N.J.S.A. § 25:1-5 et seq.; and (6) violation of the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq.

On July 16, 2012, Defendants Bellmawr Park and Levins moved for summary judgment on the entirety of Plaintiff's amended complaint. That motion was granted in part and denied in part. Count III (New Jersey Statute of Frauds claim), Count IV (ADA),

7

and Count V (New Jersey Fair Eviction Notice Act claim) were dismissed as to the Bellmawr Park defendants.  Defendants' request to dismiss the remaining claims, Count I (breach of contract), Count II (NJLAD), and Count VI (FHA), was denied.

At the time, defendant McCormick, appeared pro se and asked to join in the Bellmawr Park defendants' motion for summary judgment.  Since the motion filed by the Bellmawr Park defendants did not clearly pertain to him, the Court denied his request for summary judgment without prejudice.  Since then, McCormick has obtained counsel and has filed for summary judgment.  Following the grant of additional discovery, McCormick filed a supplemental brief for summary judgment and the Bellmawr Park defendants filed a second motion for summary judgment.  Those motions are now before the Court.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving

party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**III. DISCUSSION**

Plaintiff concedes in its opposition filed June 10, 2013,
that McCormick is entitled to summary judgment on Counts I,[6] III,
IV, V.  In addition, in its letter opposition to McCormick's
Supplemental Motion for Summary Judgment filed on December 23,
2013, Plaintiff advised the Court that he "can state no
opposition with regard to McCormick's Motion for Summary
Judgment concerning dismissal of those Counts of the Complaint
against McCormick dealing with the New Jersey Law Against
Discrimination [Count II] and the Fair Housing Act [Count IV]."
Accordingly, summary judgment shall be granted as to Defendant
McCormick on all Counts.

The remaining Counts against the Bellmawr Park Defendants
are: Count I (breach of contract), Count II (NJLAD), and Count

---

[6] In his opposition to McCormick's motion for summary judgment
filed on June 10, 2013, Plaintiff conceded that the breach of
contract claim (Count I) should be dismissed as against
McCormick because "no contract existed between McCormick and
Plaintiff."  Several months later, on December 23, 2013,
Plaintiff filed a letter memorandum arguing that "McCormick's
role in the breach of plaintiff's contract with Bellmawr Park
was substantial and integral to plaintiff's forced move out on
March 7, 2010; therefore, McCormick's Motion for Summary
Judgment with regard to the First Count of the Complaint...must
be denied."  Plaintiff provides no grounds as to why after
admitting that no contract existed and conceding the dismissal
of Count I, that the Court should now hear argument on a
dismissed claim.  In any event, as described *infra*, the breach
of contract claim shall be dismissed because Plaintiff has not
provided sufficient evidence to support his claim that
Defendants created circumstances by which he felt coerced to
leave Bellmawr Park and could no longer occupy his dwelling.

IV (Fair Housing).  For the reasons explained below, the remaining Counts shall be dismissed and summary judgment granted as to all Defendants.

### A. Breach of Contract (Count I)

Hibbert asserts that the Bellmawr Park Defendants breached the Mutual Ownership Contract when they "wrongfully and unlawfully removed, evicted and dispossessed Plaintiff and his family" from the Bellmawr Park property in March of 2010. Plaintiff avers that, as a result of Defendants' breach, he and his family were forced to move out of their home and incurred substantial expenses.

Under New Jersey law, a breach of contract claim requires proof of three elements: (1) the existence of a valid contract, (2) defective performance by the defendant that resulted in a breach, and (3) resulting damages.  MacWilliams v. BP Prods. N.A., No.Civ.A.09-1844, 2010 U.S. Dist. LEXIS 124727, at *16 (D.N.J. Nov. 23, 2010) (Kugler, J.) (citing Coyle v. Englander's, 488 A.2d 1083, 1088 (N.J. Super. 1985)); see also Peters v. U.S. HUD, No.Civ.A.04-06057, 2006 U.S. Dist. LEXIS 4727, at *10 (D.N.J. Feb. 1, 2006) (Kugler, J.) (internal citations omitted).  "Under principles of contract law[,] the construction and legal effect of an unambiguous writing is for the court and not for a jury.  Summary judgment may be entered

in a case where the court is asked to construe contractual clauses that are clear and unambiguous despite the parties' differing views as to what consequences flow from those provisions." United States v. Bills, 639 F.Supp. 825, 829 (D.N.J. 1986) (citing Cnty. of Erie v. Am. States Ins. Co., 573 F.Supp. 479, 483 (W.D. Pa. 1983); Wagman v. Carmel, 601 F.Supp. 1012, 1014 (E.D. Pa. 1985)).

Neither party here disputes that the Mutual Ownership Contract at issue constitutes a valid contract. Rather, the parties' contentions lie with the second and third elements of the contract claim, *i.e.*, whether Defendants breached the agreement and Plaintiff suffered damages as a result. A valid contract is deemed breached if one of the parties to the agreement does not fulfill a contractual obligation that it owes to the other party under the contract. Bills, 639 F.Supp. at 829. Further, "[t]o prove resulting damages, a plaintiff must prove that he suffered a quantifiable loss that was 'the natural and probable consequence[]' of the defendant's breach." MacWilliams, 2010 U.S. Dist. LEXIS 124727 at * 16. The Supreme Court of New Jersey has interpreted this to require proof that the plaintiff's alleged damages were "a reasonably certain consequence of the breach" at the time that the parties

contracted.  Id. (quoting Totaro, Duffy, Cannova & Co., LLC v. Lane, Middleton & Co., LLC, 921 A.2d 1100, 1108 (N.J. 2007)).

Hibbert avers that Defendants breached two provisions of the Mutual Ownership Contract.  The first provision, Paragraph 5, states in relevant part as follows:

> 5. The Member shall occupy the dwelling covered by this Contract as a private dwelling for himself and his immediate family, and may enjoy the use . . . of all community property and facilities of the Project, so long as he remains a Member of the Corporation[,] occupies the dwelling, and abides by all terms of this Contract.

> The second provision of the Mutual Ownership Contract upon which Plaintiff bases his breach of contract claim, entitled Paragraph 18: Peaceable Possessions, provides:

> If the Member makes the payments herein required and performs all of the conditions and agreements of this Contract, the Corporation covenants that at all times while this Contract remains in full force and effect, the Member may peaceably have and enjoy for his sole use and benefit the property herein described, and may enjoy use . . . of all community property and facilities[.]

Hibbert relies on these two contractual provisions to argue that Bellmawr Park was obligated to allow him to peaceably use and enjoy his property without interference, so long as he remained a member of the complex and paid his rent.  According to Hibbert, Defendants violated this obligation when they

"creat[ed] circumstances by which [he] felt coerced to leave and could no longer occupy his dwelling[.]"

In the Court's previous Opinion, it was noted that the factual record was unclear as to the events that occurred leading up to Plaintiff's vacating the premises.  The Court referred to the record as "chaotic."  Since that decision, Defendants have engaged in additional discovery and provided the missing factual pieces.  Particularly, the record now reflects that Plaintiff had a signed Agreement of Sale to purchase a property in Maine.  On March 3, 2010, he received an email from DuBois Miller stating that the sellers were considering taking legal action against him if he backed out of the deal to buy the Maine property, and that he might be responsible for legal fees.

Furthermore, although Plaintiff says he did not know what the $20,000 check was for, it is clear that the $20,000 check deposited by Plaintiff was needed for a down payment on the Maine property at the closing scheduled for March 8, 2010.  Indeed, $17,000 was used for that purpose.

Also, Plaintiff's assertions that he was confused as to what was happening when he moved out Bellmawr Park and that he had no intention of moving is not supported by the fact that he attended a closing on March 8, 2010, paid closing costs from funds he received from McCormick, signed the necessary

14

documents, and then moved into the Maine property as his residence immediately after the closing.

Plaintiff did not present any facts to the Court, prior to the Defendants undertaking supplemental discovery, advising the Court of the purchase of the Maine property.[7]  Plaintiff now argues that although he attended the closing on March 8, 2010 to purchase a residence in Maine, and moved in that day, from March 5-7, 2010, he had no place to move.  He states that he sent an email to DuBois Miller on March 2, 2010 telling her he wanted to back out of the deal and that DuBois Miller testified that she considered the deal "dead" as of March 4, 2010.  Plaintiff maintains that Levins spoke with Mark, Jr., on the evening of March 5, 2010, and told him that Hibbert was required to move out.  Hibbert argues he only went through with the deal after Levins told him he had to leave.  Hibbert further argues that he had neither secured a mortgage for the Maine property, made arrangements to have his son enrolled in school in Maine, and did not order a moving vehicle until March 6, 2010.  Hibbert

---

[7] The Court finds Plaintiffs' lack of candor to the Court about the facts surrounding his decision to purchase a home in Maine to be disingenuous.  The Court notes that Plaintiff's omission has resulted in not only additional time and cost being expended by counsel, but has consumed limited judicial resources.  The Court will not take up this issue at this time, however.  Rather, as noted on the docket [No. 80], Defendants have been granted leave to file motions for sanctions following the decision on the motions for summary judgment.

also argues that he never signed any written agreement to move
out of Bellmawr Park.

Plaintiff has not presented sufficient facts that could
show that Defendants coerced him into leaving.  In the Court's
prior Opinion, based on the factual record at that time, the
Court could not exclude the possibility that a reasonable juror
could find that Defendants created, or least contributed to,
circumstances under which Hibbert felt coerced to leave.  This
was based on the fact that Hibbert stated he felt overwhelmed
and confused as to what was happening, did not understand why he
was given a check for $20,000, and that he had no intention of
moving to Maine.  The current factual record shows that Hibbert
had intended to move to Maine, found a property, cashed the
$20,000 check in order to provide a $17,000 down payment, and
purchased a home in Maine on March 8, 2010.  Although DuBois
Miller may have considered the deal "dead" on March 4, 2010, she
certainly did not think so a day or two later.  After she
informed Hibbert that he would lose his deposit and would likely
be sued if he backed out of the deal, Hibbert told her he wanted
to proceed.  Although Hibbert argues that he had not made
preparations for a mortgage, schooling, or a moving van, he has
not indicated how any of these facts support a finding that

16

Defendants forced him out of his home rather than just bad planning on his part.

In viewing the record in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to present sufficient evidence for a jury to conclude that Defendants interfered with Plaintiff's peaceful use and enjoyment of his property. As such, summary judgment on the breach of contract claim will be granted.

### B. NJLAD Claim (Count II)

The NJLAD provides that:

> All persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of . . . real property without discrimination because of . . . disability[.]

N.J.S.A. § 10:5-4. The Act goes on to specifically state that it is unlawful to:

> discriminate against any person or group of persons because of . . . disability . . . in the terms, conditions or privileges of the sale . . . of any real property[.]

N.J.S.A. § 10:5-12(g)(2). The Administrative Code accompanying the Act further indicates that "[i]t is unlawful for any person to . . . [r]efuse to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling." N.J.A.C. § 13:13-3.4(f). By the

same token, however, it has also been recognized that "a duty to provide a reasonable accommodation for a resident with a disability does not necessarily entail the obligation to do everything possible to accommodate such a person." Shearn v. Victoriana Condo. Assoc., 2011 N.J. Super. Unpub. LEXIS 2877 (App. Div. Nov. 23, 2011)(internal citations omitted).

The Third Circuit has recognized that New Jersey courts typically look to federal anti-discrimination laws for guidance when construing NJLAD claims. See Chisolm v. McManimon, 275 F.3d 315, 325 n.9 (3d Cir. 2001) (citing Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 70 (3d Cir. 1996)). In so doing, courts usually refer to the provisions of the ADA or § 504 of the Federal Rehabilitation Act ("RA") of 1973. See Chisolm, 275 F.3d at 325 n.9 (looking to the ADA for guidance); Borngesser v. Jersey Shore Med. Ctr., 774 A.2d 615, 621 (N.J. Super. 2001) (relying on § 504 of the RA); Hall, 777 A.2d at 1009 ("For the purpose of this analysis, there are no significant distinctions between the RA and LAD claims."). Federal law requires entities to take appropriate steps to ensure that communication with a disabled person is as effective as communication with others that are not disabled. Chisolm, 275 F.3d at 325 (citing 28 C.F.R. § 35.160(a)) (discussing Federal Regulations with respect to the ADA). With respect to disabled individuals suffering from deafness, this typically

18

requires the furnishing of an "appropriate auxiliary aid." Id.
at 326.  The Code of Federal Regulations identifies the
following programs and services as recognized auxiliary aids:

> Qualified interpreters, notetakers, transcription
> services, written materials, telephone handset
> amplifiers, assistive listening devices, telephone
> compatible with hearing aids, closed caption decoders,
> open and closed captioning, telecommunications devices
> for deaf persons (TDDs), videotext displays, or other
> effective methods of making aurally delivered materials
> available to individuals with hearing impairments.

28 C.F.R. § 35.104(1).  The Regulations further indicate that
primary consideration should be given to the requests of the
disabled individual in determining which auxiliary aid or
service is necessary, and that, although written materials may
be sufficient for effective communication in some instances, a
qualified interpreter may be necessary if the information at
issue is particularly complex.  28 C.F.R. § 35.160(b)(2); id.
Pt. 35, App. A.  Further, the entity should bear the cost for
providing the reasonable accommodation.  See Soto v. City of
Newark, 72 F.Supp.2d 489, 496 (D.N.J. 1999).

Federal law, however, only requires that "appropriate"
auxiliary aids be provided; it does not "mandate services which
produce the identical result or level of achievement for
handicapped and non-handicapped persons[,] so long as they
afford handicapped persons equal opportunity to obtain the same
result, to gain the same benefit in the most integrated setting

19

appropriate to the person's needs." <u>Borngesser</u>, 774 A.2d at
622-23 (citing 45 C.F.R. § 84.4(b)(2)) (internal quotations and
ellipsis omitted).  Further, "[w]hat auxiliary aids would be
required is a fact-sensitive issue that must be considered
within the parameters of what is meant by 'effective
communication.'"  <u>Borngesser</u>, 774 A.2d at 623.  The New Jersey
Superior Court has indicated that there is no singular
definition of "effective communication."  <u>Id.</u> at 624 (internal
string citation omitted).  Rather, as noted by the Third
Circuit, "the effectiveness of auxiliary aids and/or services is
[typically] a question of fact precluding summary judgment."
<u>Chisolm</u>, 275 F.3d at 326.

In this case, Plaintiff asserts that he is unable to
understand and communicate proficiently in the English language,
and that his native language is ASL.[8]  He states he does not know

_____

[8]   Although ASL is related to the English language, it is unique
in nature.  As noted by a law review article cited by the Superior
Court of New Jersey:

Although derived from English, ASL is a distinct
language "with a separate historical tradition, and
separate morphological and syntactic principles of
organization."  For example, while an English speaking
person might ask "[h]ave you been to San Francisco?," an
ASL user might sign ""[t]ouch San Francisco already
you?"" While an English speaking person might ask, "What
are your hobbies?," an ASL user might sign, "Time off do
do do?"  Moreover, ASL is based on a limited number of
signs representing primarily concrete terms, and thus
the average ASL user has a limited knowledge of English
words.

how to read lips.  Further, while he has previously utilized
note taking, written materials, and certain types of videotext
displays as auxiliary aids, he has testified he only uses these
methods to transcribe and interpret short messages and thoughts.
During important events or situations involving complex
information, Hibbert states that he always requests that an ASL
interpreter be present.  While several members of his family
have previously assisted him in translation throughout his life,
none of them are certified ASL interpreters.

In the Court's previous Opinion, the Court noted that
Hibbert did not identify when and where Defendants denied him a
reasonable accommodation.  The Court found that the only
relevant events during which Hibbert may have been denied a
reasonable accommodation would have been the December 2009
meeting with the Board of Trustees and the events surrounding
the departure from his home on March 7, 2010.  The Court
concluded at that time that there were too many unsettled facts
surrounding Hibbert's communications prior to and during the
move in order for the Court to decide as a matter of law that
Defendants did not discriminate against him by failing to

--------------------

Borngesser, 774 A.2d at 618 n.1 (citing Bonnie Poitras Tucker,
*Access to Health Care For Individuals with Hearing Impairments*, 37
Hous. L.R. 1101, 1105-06 (2000) (footnotes omitted)).

reasonably accommodate his disability.  This was based on an unclear record about whether Plaintiff wanted to move, and the circumstances regarding the conveyance of the $20,000 check and what relationship it had to the undocumented purported sale of Plaintiff's interest in the property.

The record now, however, does not support Plaintiff's contention that he was overwhelmed and confused over the events leading up to his move from Bellmawr Park.  Rather, evidence in the record shows that Plaintiff purchased and moved into a residence in Maine right after he moved out of Bellmawr Park, and that he used the money paid to him for improvements to the Bellmawr Park house as a down payment on the Maine residence. The evidence shows that rather than Plaintiff having been confused about what occurred, he simply changed his mind and wanted to move back to Bellmawr Park.  His real estate agent, DuBois Miller, testified that after Hibbert bought the Maine property and moved in, he notified her that he was unhappy and wanted his money back.  DuBois Miller testified that she told him that the only way to get his money back would be to sell the property.

Thus, the facts demonstrate that after Plaintiff decided to move to Maine, he changed his mind and told his real estate agent on March 3, 2010 that he no longer wanted to move.  After

she advised him he would lose his deposit money and may be sued by the sellers, he changed his mind again and decided to move. After purchasing the property in Maine, Hibbert again changed his mind and wanted to move back to Bellmawr Park.  Although Hibbert may have had mixed feelings leading up to the move to Maine, and may have later regretted his decision, there is no evidence that he did not fully understand what was happening.

Nonetheless, Hibbert has argued that Defendants failed to provide him with an ASL interpreter during these events.  The Defendants have maintained that an alternative effective means of communication was used.  Hibbert has not provided evidence to support a finding that other means of communication, other than an ASL interpreter, were not effective during these events.  See Hall v. St. Joseph's Hosp., 777 A.2d 1002, 1014 (N.J.Super.A.D. 2001) (plaintiff maintains burden of proof if defense of alternative effective means of communication is raised). Accordingly, the Court will grant summary judgment on the NJLAD claim.

### C. Plaintiff's Fair Housing Act Claim (Count VI)

The Fair Housing Act ("FHA") was designed to "provide, within constitutional limitations, for fair housing throughout the United States." Eastampton Ctr., LLC v. Twp. of Eastampton, 155 F.Supp.2d 102, 116 (D.N.J. 2001) (quoting 42 U.S.C. § 3601).

23

With respect to disabled individuals, the FHA specifically states as follows:

> It shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person.

42 U.S.C. § 3604(f)(2)(A).  The FHA further provides that the term "discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]"  42 U.S.C. § 3604(f)(3)(B).  A violation of the FHA may be established by showing that the challenged action was either: (1) motivated by intentional discrimination, or (2) resulted in a discriminatory effect, even absent evidence of a discriminatory motive. Eastampton, 155 F.Supp.2d at 110 (internal citations omitted); see also Torres v. Franklin Twp., No.Civ.A.09-6282, 2011 WL 6779596, at *6 (D.N.J. Dec. 22, 2011) (Rodriguez, J.) (internal citations omitted).

Hibbert's FHA claim is essentially a re-characterization of his NJLAD and breach of contract claims.  As expressed above, based on the supplemental record now before the Court, Hibbert has not provided evidence that Defendants discriminated against him by failing to reasonably accommodate his disability during the move.  There is insufficient evidence that Defendants failed

to accommodate Hibbert's disability or interfered with the use
and enjoyment of his home.  Any subjective belief by Plaintiff
that he was being forced from his home was not due to any
confusion created by Defendants by an alleged failure to
accommodate his disability.  Accordingly, summary judgment will
be granted.

**IV.  CONCLUSION**

    For the reasons set forth above, Defendants' Motions for
Summary Judgment will be granted.

    An appropriate Order follows.


                                s/Noel L. Hillman

At Camden, New Jersey        NOEL L. HILLMAN, U.S.D.J.


DATED: _  June 27, 2014____